DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1909.

---

### Rel W. Randall, Appellee, v. Albert A. Newman, Appellant.

### Gen. No. 14,526.

VERDICTS—*when not disturbed.* A verdict will not be set aside on review as against the weight of the evidence unless clearly and manifestly so.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. JOHN H. HUME, Judge, presiding. Heard in this court at the March term, 1908. Affirmed. Opinion filed June 8, 1909.

DENT & JACKSON, for appellant.

BULKLEY, GRAY & MORE, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

This is a suit by Rel W. Randall, plaintiff below, against Albert A. Newman, defendant below, on a promissory note made by the defendant, payable to the order of W. H. Burn, of date August 15, 1906, for the sum of $1,250, due 90 days after date, with interest at 5 per cent per annum. The note was endorsed by the payee, but it was admitted by plaintiff's counsel, on the trial, that the plaintiff stands in no better posi-

(1)

tion than would the payee if he were the plaintiff, so
that W. H. Burn is to be regarded as plaintiff, for
the purpose of decision.

The case was tried by the court, without a jury, and
the court found the issues for the plaintiff and as-
sessed his damages at the sum of $1,332.27, and ren-
dered judgment on the finding.

The note in question was given for mining stock of
the Arsenical Ore Reduction Co., the mine of that com-
pany being in Canada.  The defendant first purchased
50 shares of the stock, and gave his note for $2,500
for the shares.  Subsequently, by agreement between
him and Burn, the purchase was changed from 50 to
25 shares, defendant's $2,500 note returned to him, and
the note in question for $1,250 given.  It is contended
by defendant's counsel that the giving of the note in
question was induced by false and fraudulent repre-
sentations made by Burn, which deceived the defend-
ant.  Only two witnesses, the defendant and Burn,
testified in regard to the statements made by Burn, in
respect to the mine, and their testimony is contra-
dictory.  Defendant testified, in substance, that Burn
told him that he had a good thing in a mine in Canada,
which produced a large quantity of arsenic and gold
—an arsenical production; and that he was selling a
good deal of it in New York city; that he had 500
shares for which he paid $50 per share, which he would
not sell at any price, and which he intended to keep
as a nest egg for his children; that the regular price
was $100, and none of it could be had for less.  He
said the name of the company was the Arsenical Ore
Reduction Co.  Defendant said to him, "If that is as
good as you say, I would not mind having some stock
of that kind," and Burn said he did not believe he
could get it for less than $100, if he could at all.  He
said the mine was in splendid condition, was paying,
and that they were making money; that they had a
railroad and were putting in machinery to add to the
output, and that it was going to be an immense thing.
The conversation, in which defendant says the fore-

going statements were made, occurred on a railroad train bound for New York city. It does not appear from the evidence that Burn, in that conversation, offered to sell any stock to defendant.

Defendant further testified that the next morning Burn came to him and said he remembered the president, or some one, told him some treasury stock was to be sold for development purposes, and he would see Mr. Beckwith, the president of the company, the next day, and might be able to get him some stock at the price he, Burn, paid, and defendant told him all right, to let him know about it, and that he, defendant, being on his way to Europe, thought no more about it. June 12th, Burn came aboard the boat on which defendant was, and said to him that he had seen Mr. Beckwith and he said that he, Burn, could get that stock for defendant, and defendant said, "Let it rest until I come back," which was all that was said about the stock at that time.

Burn testified, in substance, as follows as to what occurred in the conversation between him and defendant, before the latter left New York city for Europe: Defendant asked him if there was any stock for sale, and he told him he did not know of any; that so far as he knew the company was not offering any, but that he would see some parties in New York, and if he found he was able to get any he would let defendant know. He did not tell defendant that he had 500 shares, or how much he had, nor did he tell him that he paid $50 a share for his stock, nor that the mine was a paying mine, nor that he would see Mr. Beckwith and ascertain if any treasury stock could be obtained; that nothing was said about treasury stock at any time; nor did he tell defendant that the stock was worth $100 per share or was selling or had been sold at that price. On cross-examination Burn testified that he did not tell defendant whether the mine was on a commercial basis, that he told him it was in a development state. Defendant testified that after his

return to Chicago, and between August 10 and 15, 1906, Burn called on him and said he had obligated himself to take the stock, and defendant said he did not see why; that he had not given him any regular order to buy, when Burn said he would just as lief have defendant's note, which he could use as money, and defendant said if he, Burn, had obligated himself, he would take 50 shares if everything, including the mine, was as he had told him on the train. The trade was then made for 50 shares. When the certificate for the shares was delivered to defendant he says that he said to Burn, "I thought you were going to give me treasury stock in the company," and Burn said, "This is the same as treasury stock. I am going to get it from Beckwith. I will give you some of mine for the present to take its place." Defendant testified that, about August 20th, he wrote to Mr. Beckwith, president of the company, Mr. Thatcher, secretary of the company, and Mr. Loomis, a friend of his in New York, inquiring about the mine, and asking Loomis to find out from the officers about it, and received the following letters:

"New York City, Sept. 8/06.

MR. A. A. NEWMAN,
        Masonic Temple Building,
                Chicago, Ill.

Dear Mr. Newman: I have called upon Mr. Luff of the Arsenical Ore Reduction Co., who advises me that the operation of the Company is at a standstill, and that it is very doubtful whether their stock is worth anything or not, and that they are having their own troubles with the securing of electrical power with which to operate their plant and he wanted me to meet some man in charge of the Bradstreet Agency and who is president of their company with the idea of seeing if I could not help them out. It looks to me very much as if this proposition did not amount to anything. He claimed that they sent a man to Europe to see if he could not find a way of disposing of the crude ore as they mine it, and this man returned and reported there was no way of utilizing the ore abroad.

I am looking forward to seeing you again with a great deal of pleasure and trust you will advise me before you come on.

Very truly yours,<br>BRUCE E. LOOMIS.''

''No. 320 Broadway, New York,<br>Aug. 22, 1906.

A. A. NEWMAN,
   710 Masonic Temple, Chicago.

Dear Sir: Acknowledging receipt of your esteemed favor 20th regarding the value of the Arsenical Ore Reduction Co. stock, would say that it is rather difficult for me to answer this question. The stock is not listed, and any transactions are of a personal character and may or may not reflect the value of the stock. The Company, as you probably are aware, has not as yet transacted any regular business, but is rather in a stage of development.

Regretting my inability to give you more satisfactory information, I beg to remain,

Respectfully yours,<br>The Arsenical Ore Reduction Company,<br>W. E. THATCHER,<br>Secretary.''

''346 Broadway, New York City,<br>September 10th, 1906.

MR. CHARLES E. RENSHAW,
   Care Newman Clock Company,
      710 Masonic Temple, Chicago, Illinois.

Dear Mr. Renshaw: I am in receipt of your favor —which came during my absence from the city—inquiring in behalf of Mr. A. A. Newman with regard to the affairs of the Arsenical Ore Reduction Company. I also find a letter awaiting me from Mr. Newman bearing date August 20th, on the same subject. I am informed by our Secretary, Mr. Thatcher, that he also received a letter of like purport and date from Mr. Newman, to which he made reply on the 22nd ultimo, covering the facts as to the present status of the Company, the value of its stock, etc. I am unable at this time to add anything to what Mr. Thatcher has stated. The company is not operating, and I cannot

say definitely when it will be, as we shall require some additional capital before we can undertake the proposed development of our Canadian property.

Mr. Thatcher unites with me in kind personal regards and best wishes. I remain,

Yours very truly,

CHARLES L. BECKWITH.''

Renshaw wrote to Mr. Beckwith by defendant's request. After receiving these letters the defendant, about September 26, 1906, saw Burn, and asked him to take the stock back, and offered to pay him $500 to do so. Burn refused, but offered to take back twenty-five shares, give up the $2,500 note, and take defendant's note for the twenty-five shares. Defendant testified that, when the proposition was made, he said to Burn, "Of course it is understood that this is treasury stock and the money will be used for development purposes," to which Burn replied, "Yes, that is so understood." It has already been stated that Burn testified frequently and emphatically that nothing was said about treasury stock. It is noticeable that, when defendant agreed to take the fifty shares, he said nothing about treasury stock. He testified, ''I said that if he had obligated himself, I would take fifty shares, if everything was as he said, and the mine was in the condition he had told me on the train. He said it was, and they would make a lot of money, and finally I consented.'' Not a word about treasury stock. This testimony of the defendant is, to say the least, remarkable. He had just learned from the president and secretary of the company that the company had not transacted any regular business, but was rather in a stage of development, and from his friend, Mr. Loomis, that operation was at a standstill, and that it was doubtful whether the stock was worth anything, and yet he claims to have relied on what he says Burn told him on the train. When defendant received the certificate for fifty shares, his own testimony shows that he knew it was not treasury stock. He testified

that he said, "I thought you were going to give me treasury stock in the company." It was intended that the fifty shares should be sent to New York by Mr. Carlson of the State Bank of Chicago, to be split into two certificates of twenty-five shares each, and defendant executed the following document:

"Received from W. H. Burn, order on Arsenical Ore Reduction Co., Newark, New Jersey, for fifty shares of stock, said order being duly signed by its president, Chas. L. Beckwith.

I agree to have this order forwarded to the president of the Company, Mr. Beckwith, and to have issued in its place an order for twenty-five shares to W. H. Burn. The remaining twenty-five shares to be transferred to myself (A. A. Newman), which I have bought and paid for, and which Mr. Burn has duly assigned to me.

Chicago, Sept. 27th, 1906.        A. A. Newman."

Mr. Carlson, witness for defendant, after testifying to the agreement for the twenty-five shares, was questioned and answered as follows:

"Q. You understood, at that time, that was a settlement of the former deal, did you?

A. Yes, sir, a compromise."

Mr. Nanz, defendant's witness, testified, on cross-examination, that Burn said, if defendant felt so badly about it, they might come to some arrangement, and that he, Burn, would take twenty-five of the shares, defendant's note to be changed to a note for $1,250, and that he would return defendant's note and they would settle the matter up, and defendant said, "I accept that, and if you will bring the note tomorrow we will settle."

Burn testified that defendant said to him, "Now, Mr. Burn, I have a proposition to make to you, and it is this, that you let me take twenty-five shares of that stock, which I will pay you for, and return me my $2,500 note, and I will feel that you have done a square thing, and we will be good friends, and I hope we will find the stock is a good investment." Mr. Burn fur-

ther testified that, when they went to the State Bank, defendant said to Mr. Carlson that "he had effected a settlement with Mr. Burn and was going to take twenty-five shares instead of fifty."

We think the evidence fully warranted the court in finding that the exchange of defendant's fifty shares of stock and his note for $2,500 for twenty-five shares and his note for $1,250, was a settlement between him and Burn of all differences between them. At least such finding is not manifestly against the weight of the evidence.

An attempt was made by the defendant to rescind the contract after the suit was commenced, but in the view we take of the evidence, there was no right to rescind. Neither do we think there was anything to recoup, as contended by defendant's counsel.

There is evidence in the record tending strongly to prove that the mine is of great value and that the investment will prove a profitable one.

Defendant's counsel submitted to the court sixteen propositions to be held as law in the case, eight of which the court held and refused the remainder. Counsel contend that the court erred in refusing certain of the propositions. We think the propositions marked "held" state the law applicable to the evidence as fully as the defendant is entitled to, and that there is no reversible error in the refusal of any of the other propositions.

The judgment will be affirmed.

*Affirmed.*